and we'll hear first from Mr. Mendelsohn. Thank you Judge Jones and may it please the Court. The easiest way to dispose of this appeal is on qualified immunity's clearly established prong. Neither the District Court nor McClain has cited a case sufficiently analogous to this one to meet that prong, as the Supreme Court has repeatedly held is required. Nor can McClain show that no reasonable officer would have arrested him because Trooper McKay would have, and plain if never suggest that McKay was unreasonable. I'd like to begin there and then time permitting explain why Delgado had probable cause to arrest McClain in any event. I'd like to begin with what the District Court said about qualified immunity's clearly established prong. Before you get into that portion of your argument, I was struck by the fact that Delgado is a game warden and I'm sure Texas law provides for game wardens making traffic stops and arrests in that genre. I didn't see any briefing about that and so I'm not even sure, I guess as a matter of public record, we can look at their authority, et cetera. Sure, so game wardens are peace officers within the meaning of Texas law, but I guess the other point I would make is that . . . Well, I hadn't finished my question. Oh, I'm sorry. So I guess there's some law enforcement experience or training. Is there any evidence in the record about that, his law enforcement training or experience as a true law enforcement officer vis-a-vis traffic stops? Yes, so Mr. Delgado, I believe the record reflects that he participated in the Air Raid Training Program, ARIDE, which is a program that peace officers can go to to learn about things like DWIs and intoxication and field sobriety tests. There's a portion on the video where you see him looking at an air raid card, which is a document that officers have to help them determine if somebody is intoxicated or not, for example. I guess the only other point I would make is that there's no dispute in this case. Certainly my friend on the other side hasn't raised it, that he didn't have the authority to make the arrest. I know it. That's not in dispute that he did have the authority. I'm just struck by a game warden engaging in all these traffic stops and tickets. Now, along that line, what is in the record about this supposed TV show? So the issue of the TV show certainly was not briefed to this court. There may be a couple excerpts in it from a deposition. My understanding about that is that Mr. Delgado is no longer involved in that, but I don't think that's the issue. We reviewed the record de novo, and so I want to know what's in the record about his television experience. Right. My understanding is that he filmed for a show at some point for a little bit and then stopped. I think there's an excerpt from a deposition where he addresses that, but there's just an excerpt here and there about that. When he stopped with the TV show or when he was engaged with the television show, what proximity was that to the time of the arrest? I'm not sure. But — Is it in the record, the date when he stopped doing that? I'm not sure. I think the record — I think he just talks about in a deposition excerpt how he's no longer part — about how he's no longer part of that. But is that deposition excerpt in the record? Yes. All right. At least there's a piece of it. At least there's a piece of it that's in the record. It's attached to one of the motions for some — the motion of the opposition, I think, to some degree. Gotcha. But I don't think that the court needs to reach that issue, and that's because what the district court said was that it just simply said, well, it's clearly established that you can't arrest somebody without probable cause. But that's exactly what this Court in Lofton v. City of Prentiss said was insufficient to meet that standard. And that's because Supreme Court cases like White v. Foley and this Court's cases like Estate of Joseph all explain that in the words of White v. Foley, the lower court, quote, misunderstood the clearly established analysis. It failed to identify a case in which an officer under similar circumstances would have violated the Fourth Amendment. It seems that my friend on the other side is relying on a somewhat different line of cases about Frank's liability. But Frank's liability really just addresses the distinct issue of false information in a warrant application. And for that reason, those cases are an opposite. So is Guerra, which not only is a Frank's liability case, but it's also a case that was decided in 2023 when the facts of this case occurred in March of 2020. And so for that reason, it can't be used for clearly established purposes. The same is true with the Atkins case, which both postdates the facts of this case and is also an unpublished opinion in any event. I think the last case that my friend on the other side really relies on for the clearly established prong is De'Vea. But the problem with that case is that the officer there admitted that he had a history of problematic arrest, such to the point where even the sheriff and the DA said that they no longer trusted him. And at least in that case, there was a major factual dispute about the speed and about what the speed of the car was, because it was a speeding case. And that's very, very different from this case. And I do want to go a little bit into the facts of this case, because in this case, McClain admitted that his vehicle was swerving, and Officer McKay had corroborated the results of the HGN test. So it seems very difficult on those two facts, which are enough alone. The officer, McKay, corroborated the testing after the arrest had been made, didn't he? Yes, that's correct. And so that means it shouldn't be used for the purposes of determining probable cause, but it's relevant for two very important things. It's relevant because it seems that my friend on the other side at the summary judgment stage is attacking the officer's credibility. That seems to ring somewhat hollow when another officer reaches the same result. And the other point is that qualified immunity is very commonly stated as no reasonable officer would have made this arrest under these circumstances, but we have another officer who would have made the arrest under these circumstances. So we're not submitting that point precisely for the issue of probable cause. We're presenting it for the point of the credibility issue and the issue, more importantly in our view, that no reasonable officer would have done that. I do want to be sure to address some of the specific facts that are going on here, and that is that at Record 371, which is the operative complaint, Mr. McClain admits that his vehicle was swerving. He says that he told Delgado he was messing with his radio, which is the direction the vehicle jerked. He also says Delgado had reasonable suspicion to stop him. That's on the same page of the operative complaint. And so for that reason, certainly to that fact, and again, this is summary judgment where credibility determinations are not appropriate in any event, that's an admitted fact, and the district court conclusively erred when it cited minutes 210 and 220 in its opinion to say that Mr. McClain had denied that fact in the video. That's just not what the video says. The video says, I'm sorry, I was messing with my radio. I'm sorry. The district court read that as a denial. That's just not what's on the tape. And as long as we're on that point, the district court also conclusively erred when it seemingly suggested that a Terry stop required probable cause as to reasonable suspicion. That, of course, is just not true. I do want to— Mr. Mendelson, I just simply want to remind you again that we review this de novo. We don't—we're not grading the opinion by the district judge. This is de novo review. Yes, that's of course correct. And qualified immunity requires the plaintiff, and this is a State of Joseph. What a State of Joseph says is we're not going to—it's the plaintiff's burden to show us a case sufficiently analogous to this one. We're not going to comment on if the plaintiff could, only that he did not meet his burden in that case. And because Mr. McClain here on appeal—I'm not necessarily talking about the district court's opinion right now—hasn't cited a case sufficiently analogous to this one, but is only relying on statements at a high level of generality, on that alone, this court could dispose of this case and— What are the operative facts on which you base no clearly established law? Three facts. There's only three material facts here. The first is the admission of the site of a swerving vehicle. The second is the HGN test. The third is the walk-and-turn test. Although, we don't even think that you would need both of those tests. And I want to go over a little bit about what those tests were and what the officer saw and what the expert report stated about those tests. What I'm referencing here is record 858 and 860. By the expert's own admission, Delgado did the test within the NHTSA standards. I think that's a very important point to make. What the expert says is that when the officer checks for what it calls a lack of smooth pursuit, it should take approximately two seconds to move the pen from here to here. That's what the expert says. The expert faults the officer because four times he moved the pen at a speed of two seconds and two times at a speed of three seconds, even though he says the standard is, quote, approximately two seconds. That's within the NHTSA standards. The other point that the expert makes is he says, well, when the officer was doing the HGN test and checking for what it calls nystagmus at maximum deviation, which is simply a way of saying holding the pen here and holding the pen here and seeing if somebody can focus on it with their peripheral vision. The expert says, hold the pen there for a minimum of four seconds, but certainly don't hold it there for 30 seconds or more because the eyes will get tired. And then he says the officer held it there for between nine and 11 seconds. The expert's own rules that he cites in his report say that Delgado did the test within the NHTSA standards. The reason why that's very important is because probable cause can't be vitiated by a reasonable mistake of fact within the meaning of high NB North Carolina. So at the very most, the expert report either means Delgado did the test exactly correctly or he did the test within the NHTSA standards, and surely that would just simply be a reasonable mistake of fact. That doesn't vitiate probable cause. The last point, or I guess two more points that I want to be sure to make, is the next one is the walk and turn test. And what the expert says about the walk and turn test is, well, I only saw one clue on the video. Well, of course he only saw one clue on the video, and that's because that second clue that's necessary to reach the 79 percent probability in order to establish probable cause, because, of course, this Court has defined probable cause as less than a preponderance of the evidence, less than 51 percent, was that the officer, according to the NHTSA manual, was supposed to be checking to see if the feet were stepping at more than a half inch gap, if there was more than a half inch gap between the heel and the toe. And the video simply doesn't show closely enough as to whether that was happening or not. So that's an undisputed fact. And if McLean had wanted to dispute that fact, he could have submitted an affidavit. Or if he'd wanted to dispute the swerving vehicle, he could have submitted an affidavit. And so those are undisputed facts. And those three facts collectively, the sight of a swerving vehicle, an HGN test, which has about an 88 percent accuracy, and a walk-and-turn test, which has about a 79 percent accuracy, and what those percentages refer to is the odds of being intoxicated within the meaning of .08, within the meaning of Texas law. Those are more than enough, certainly collectively, to establish probable cause. I also want to be sure to address what, in our view, is a non-sequitur, that HGN couldn't possibly be present because of a negative blood test. That's a non-sequitur for three reasons. The first is what I addressed earlier, which is the tests are not designed to create guilt beyond, to establish guilt beyond a reasonable doubt. They're designed to establish probable cause. They're not perfectly accurate, and they're not something that can show beyond reasonable doubt. But they are something that can show probable cause. The second thing, and this is at record 699, is that there are confounding variables, things like neural system disturbances, brain damage, ear diseases, that can throw the tests off a little bit. This court had a case called Alamang v. Louisiana Department of Public Safety. We mentioned in our brief that it was about amblyopia, which is a vision disorder, which can also be a bit of a confounding variable. And then the other point is the blood alcohol concentration curve, the idea that as time goes on, the liver filters alcohol out through the body, which is just a way of saying when an officer does a test in the field, and a blood test is done a few hours later, it doesn't necessarily mean that the officer was wrong at the time. A good example of that is the Carrizal arrest, Alfonso Carrizal, which is talked about in the briefs. And it's interesting that my friend on the other side says, well, that's an example of how this officer doesn't know what he was doing because he admits on video, I want to be clear, Alfonso Carrizal admits on video post-arrest that he was drinking. So it's a little bit odd for them to say, well, Delgado obviously doesn't know how to do the tests after the individual admitted that he was drinking. That might be an example of a BAC issue, blood alcohol concentration curve, of tests can become negative when a blood test is done several hours afterwards. And the last point I think I want to be sure to mention is it's a feature, not a bug of the criminal justice system, that sometimes officers arrest more people than are prosecuted. And that's because they use the probable cause standard. They don't use the beyond reasonable doubt standard. That's the standard prosecutors use. And as this court has defined probable cause, it's less than 51 percent, less than a preponderance of the evidence, whereas probable cause, although – or excuse me, whereas beyond reasonable doubt, although may not technically be 100 percent, is certainly very close to it. And so it's normal and it's a feature. It's not a bug that sometimes officers arrest more. Is it a feature or just a part of life? I'm not sure why it's a feature. Because the problem – what I mean by that is – You just mean it's just how the system works. Right. What I mean – It's not a good thing. It's just a cost of having a –  What I mean is that the standard is just simply much lower. That's what I mean. That's all I mean by that. And I see I'm running out of time, so unless the court has any further questions, we ask the district court be reversed. Not at the moment. Thank you. Okay, Mr. Morgan. May it please the Court. Good morning. I'm Chad Morgan on behalf of Appellee Joshua McClain. What we have here, quite frankly, Your Honors, each of you, we have a district court that did the right thing. They looked at this court's precedent and said, we have a summary judgment motion, and there are so many material issues of fact that are disputed in this case by both sides that we can't determine at this stage, based upon the court's precedent, that whether or not Mr. McClain – excuse me – Mr. Dugato is entitled to qualified immunity or not. That's why we're asking the court to affirm and kick it back to the district court for trial proceedings on the basis that there is several areas of material fact that render a summary judgment inappropriate in this case, and the federal court did the right thing. With that, with regards to that case, I think there's several different cases. I think Terwilliger is one that's a more recent case versus Reyna that's also out of the Western District of Texas, and it discusses the summary judgment factors, and Mr. Middleton talked about the Franks issue as well. In that, we do have some Franks issues, and there are probable cause affidavit that I think the court came back and said in Terwilliger they pointed out to Milton V. Phillips, which is another president from 2017, that summary judgment being inappropriate for Franks in that case – I'm sorry, I misspoke. Summary judgment for Franks in that case is applicable to an arrest warrant affidavit. In this case, the probable cause affidavit was also an issue. Well, I don't see the state relying on the magistrate, you know, the arrest warrant here. They're going back to the arrest itself. Yes, ma'am. And was he – no reasonable officer would have thought that there was probable cause to arrest. Do you agree that that's the test for immunity? I agree that is the test, that no reasonable officer would arrest. Okay, so what are your facts that support that idea, that no reasonable officer would have arrested Pastor McLean? Yes, ma'am. In regards to that, Judge Jones, I would say that, number one, there was no odor of alcohol in the vehicle or on his person. That's the first step. Second step. But he – I mean he agreed that he swerved. Well, we disagree with that statement, Judge Jones. There's several times throughout the video, and if the court reviews the video, the court will see that. We're in – towards the end, after he's already in handcuffs. What do you mean by referring to the video? I thought there was no video. There was a video of the entire – of the – You're talking about swerving. Oh, that's correct. There is no video of the swerving. Because I think what we're talking about now is the swerving aspect. Yes, there is no video of the swerving, but I think Judge Jones – More than that, wasn't there an admission of swerving? There was not. Judge, what he said – Was it disputed? Yes. Is your client saying that there was no swerving? That's correct. He said, I was trying to – I'm sorry, I was trying to adjust my radio. That's correct. That's what he initially said. After he was arrested and in handcuffs, when he's talking to the officer after the fact, waiting on Truman McCain to arrive to the scene, he said, I don't believe I swerved, but if I did, I was messing with my radio. He said that on more than one occasion. There was an initial statement when he didn't say or admit that he was swerving. He just said, I'm sorry, I was messing with my radio. Well, again, you know, the test is reasonable suspicion, so the test for immunity would be no reasonable officer could have believed he was swerving, and the fact that you have Officer McClain saying he undoubtedly was swerving and then the best your client says is, well, maybe I was, maybe I wasn't, I'm not sure that creates a material fact issue. Well, and here's why it does, because it goes back to credibility, and here's where this is important. Credibility of the officer is key and critical when there's no video of it, and we don't have video in this case of the stop. There is no dash cam video of the swerving. That's the first step. Secondarily, beyond that, there's not anything in the record that says, number one, that just because you swerved that you're guilty of DWI, that there's probable cause that you committed a driving while intoxicated offense. So those are two different distinctions. Even if he was able to stop him on the basis of a swerve, okay, under Texas Transportation Code, it's not necessarily a probable cause issue. It's more of a reasonable suspicion issue because of the fact that it was not, there was no indication it was unsafe to do so at the time of the, any indication in the officer's report or anywhere else in the video that it was unsafe to do so, which is required under the Transportation Code for a violation of that offense, meaning swerving from the lane is perfectly acceptable if it's, so long as it's not unsafe to do so at the time. Well, that's a novel argument which I've never heard before in all these reasonable suspicion cases. Yes, ma'am. Can I just nail down, though, what you're saying the video shows him denying that he was swerving? Yes, Your Honor. Okay. Well, we can obviously check that. Yes, Judge. And so beyond that, the swerving is just one facet of that. That maybe necessitates a stop, but you still have to develop a probable cause for the arrest or DWI, and that's where we have bigger disputes that are much more material to this issue. Number one, there's no red bloodshot eyes. You can see his eyes in the video clearly on multiple occasions, from the initial stop and actually when he was conducting the HGN, which we'll get to in just a minute. Secondarily, when he does approach the vehicle, there is no odor of alcohol emitting from the vehicle. He missed that in his deposition. There is no odor of alcohol emitting from his person. He doesn't stumble. He immediately retrieves his driver's license. He has his mental faculties about him. You can tell that from the video. He's not slurring his speech. He actually had a mouthful of sunflower seeds at the time. You can see that in the video and throughout the trash and the cups of seeds in the vehicle. And you also are not, when you go to look at his statement, the first thing that Doug Otto says, have you been drinking? He said, I caught you swerving, but then he goes immediately to, have you been drinking? So he's making an assumption that because he swerved, he automatically thinks he's drinking. There's nothing wrong with that. Well, it is if that's what you're trying to do. If you're trying to pigeonhole somebody into a DWI. If you see somebody who's been swerving, there are a couple of explanations. They might have been fooling with the radio, which I confess I've done periodically, or they might be bad drivers. I mean, there are a lot of other. There's a multitude of reasons. I agree with you. Yeah, so that doesn't condemn anything. But going back to the fact of the DWI, let's switch to the HGN in particular. There's 2 minutes and 23 seconds of video total where the HGN starts and is completed. And in that time, only approximately 59 seconds of the video is where his eyes are visible or partially visible in that. There's nowhere in those videos, if the court actually examines that 59 seconds or that 2 minutes and 23 seconds where you actually see his eyes jerk. You see his eyes blink on occasion, things of that nature. But there's no clear jerking going on as Doug Otto proclaims that he sees. Moreover, and the reason that is part and partial to our materiality, is that he has to have certain factors, and that's going to the decision point to arrest under the NHTSA standards and ARIDE standards that Mr. Mendelson talked about. He didn't have that, and the video is clear on that, as well as the red bloodshot eyes. That's not only in the initial part when he's up at the vehicle and he sees a close view of his eyes, but also when he's doing the HGN, you can clearly see that his eyes are white and not red bloodshot. Let me just cut to the chase of my concern here. He called for backup. Another officer came and performed the same tests, right? Yes, ma'am. And concluded that Pastor McLean should be arrested. That is incorrect. What Mr. McKay did was he did a confirmatory check for HGN to see if he could check for HGN. He had already done all the walk and turn, one leg stand tests before Mr. McKay got there. Mr. McKay wasn't there until after he was already under arrest. So whatever Mr. McKay found is actually irrelevant. Well, I'm not sure that's the case because you're talking about two and a quarter minutes. You're talking about a short span of time until backup arrived, and then you're talking about this other officer saying he could see this eye problem, right? Yes, Your Honor. So, again, at any time after you put the cuffs on, you can always change your mind. You can. But he didn't because the other officer reconfirmed. So, again, the question is maybe Delgado was negligent. Maybe he was grossly negligent, but that doesn't mean that he was knowingly violating the constitutional law, which is the test for immunity. Qualified immunity also requires that they don't get protection when they are plainly incompetent, and that's where the prior arrest within a six-month time period showing nearly identical factors where he said HGN, only one clue on walk and turn on one of those and zero clues on one leg stand. And that's why it's a totality of the circumstances test, especially under materiality as well. Exactly what evidence did you put in the record about those prior incidents? We put the offense reports and the videos of each of those arrests as well as deposition testimony regarding those arrests as well and photographs as well. That is all in the record on it. Well, what the magistrate characterizes at is a question of credibility of the officer. Now what you're saying is it's a question of competence. No. Honestly, I believe it's credibility. That's our main argument is credibility. But at the very least, it is clear to us that Mr. Delgado does not deserve qualified immunity on the very basis. Even if this court doesn't believe that his credibility is an issue and it shouldn't play a part in the materiality, it at least plays a part into the fact that he was plainly incompetent based upon those prior arrests within a six-month time frame prior to our client's arrest based upon very similar circumstances where the blood test results show no alcohol, no drugs of any kind, and that goes back to the other part of the HGN. Regardless of what McKay found, we believe McKay had some kind of confirmatory bias being a fellow officer in that situation. But however, the other issue there is that he does not—that's not on video. It's not on McKay's video, number one. But number two, he does not have—there's no scientifically possible way that HGN could have been present. There's no other evidence in the record suggesting that he had any other problems. What we do know is that alcohol nor drugs were a contributing factor at all, and there was no other signs or anything going on during his stop that suggested that he, in fact, had any alcohol or drugs in his system. And that's part and parcel. And like I said, McKay did not go back and do the walk and turn or the one-legged stand. He didn't do any other confirmatory test. He just did the one thing that Delgado asked him to do was confirm it for me. And that's on the video. And that—and is it true that that test has a 79 percent accuracy rate? Only as to alcohol. That's the only thing that's been tested under NHTSA standards. Well? I'm just saying. But like I said, Mr. Middleton in court is to the fact that there's an elimination factor to alcohol. We all know that, and this court's well aware of that. But that's like a—I think the average is .015 per hour. Okay? The record indicates that it was like approximately, I think, an hour and 27 minutes from the time he was stopped to the time he was taken to the hospital for the blood draw. So even if that were the case, you know, regardless, there's still no odor of alcohol. What are you suing for? We're suing for a violation of Mr. McLean's constitutional right to be free from arrest. He was arrested. Did he spend the night in jail? Yes, ma'am, he did. And he had to pay a bondsman to bond him out. He paid a defense attorney, Mr. Moore, who was my co-counsel in this case, to represent him on the DWI. And he also had some towing expenses and things of that nature. That's correct. And when were the charges dismissed? I believe he was arrested in March, and he was not released of the charges until the following January, I believe. And that was when the DA's office declined to prosecute based on insufficient evidence. And what county are we talking about? Limestone County is the county he was arrested in, which is a small town called Grossbeck. Yes, ma'am. Can we go back? Sorry. Can we go back? I thought I heard you say earlier that on video he denied swerving. That's correct. Okay, I'm just looking at your brief, page 18. He states that he, your client, may have, he may have, meaning may have crossed the line while adjusting his radio, meaning he is unsure. So, and your brief goes on. What I see your brief saying is that he never admits to swerving. That's correct. That's very different from formally denying on the record, on tape. So which is it? It's actually kind of both. Because at the beginning, at that 2 minute 18 second to 2 minute 22 second, I think that's often cited in our briefs, that's where he talks about he's messing with his radio. Okay? There's a part towards the end, and if I can supplement with the 28J, I'll be happy to do so. But there is a part in the video that when he's under arrest and he's waiting on McKay to arrive, and he tells him, I did not swerve. I don't think I swerved. But if I did, there's, it was. Okay. So that's later in time in the same video.  Because I watched the video. I obviously didn't watch all of it, it sounds like. That's correct. All right. Yes, sir. So earlier, so as I understand it, he basically says he's not sure. He may have, while adjusting his radio later, he denies it once he's in cuffs. That's correct. Okay. That's correct. So our contention is that, you know, obviously based on the fact that there are material dispute effects, especially about the probable cause to arrest, and regarding the video, which we ask the court to rely on. It's just a de novo review. The video is clear. How can we sit back and watch a video of an arrest for DUI, I'm just asking generally, and conclude that there's no way that the driver could have been drunk? Well, based on the same way he made a determination to arrest, if there's jerking in his eyes. Well, excuse me, but, well. And there's no order of alcohol. I mean, does the dash cam, this is a dash cam video, right? It's a body cam. Well, even if it's a body cam, I can't see your eyes from where I am. I can't, I couldn't see my colleague's eyes from where I sit. How can we second guess that test? If I can point the court to. . . And we'll look at this as soon as the argument is over. Yes, ma'am. I've got the actual tally. It's two videos where that is located. Well, it's not a long video, so I'm not worried about that. Yes, ma'am. Okay, from 9.54 in the video, in the body cam video, starting at actually 9 minutes and 50 seconds is where the HGN starts. Okay. And I have an outline. There's 9.54 to 10.29. It's a 35-second period where the eyes are visible on the camera and their eyes are not jerking. It's 10.32 to 10.34 is a visible 10.46 to 11.06. Well, but again, I've never been trained in that exam. I don't know a thing about it. I dare say my colleagues probably don't either. So how can we just watch the video of these events and conclude that no reasonable officer would have. . . that there's a material fact issue that no reasonable officer would have arrested? Because when you see on the video and see his eyes, and his eyes are still and they're not jerking back and forth, and that's what they'll ask you to look for is a small jerk. I don't know about that. Yes, ma'am. I mean, I'd have to go to extrinsic materials like Google, tell me what, God forbid, AI, tell me what this nystagmus test says, but I'm not allowed to do that. I have to go on what's in the record. But there's also the two other tests, the walk and turn and the one-legged stand. The walk and turn, we don't even think there's really that one clue, but if there is even that one clue on the walk and turn, which is the decision point is two or more, as well as on the one-legged stand, he did it for 43 seconds. The standard is 30 seconds. The body cam shows how his feet were moving along the line. Yes, ma'am, it does. There are portions of it that it does. Same with the one-legged stand. He does the one-legged stand, and you also notice on the video, he's not swaying at any point in time. He's not stumbling when he's walking towards the officer. He's not holding on to the door. There's all different factors that the NHTSA's manuals tell the officers to look for under the totality of the circumstances in making their determination, and that's why the credibility factor is so important as to whether or not if you, just like you're saying right now, how am I supposed to make that determination? It goes to the credibility of the officer, and that's what the district court. I don't see this as a matter of credibility. Well, I believe under the court's precedent that that's why, and that's what the district court cited too, is that that is a factor. Credibility is a factor, especially when you're trying to determine the materiality of it and whether or not an officer's entitled to qualified immunity. I just read paragraph 38 of what I believe is your operative complaint. Your client also tells the officer he was messing with his radio, which is to his right, which is the direction the vehicle jerked. Yes, Your Honor. Your complaint says the vehicle jerked. That was directly from the report that we pulled that from. That's from the officer's report. That's correct. That was a statement from the officer's report that's in there. That's correct. Well, I don't see that. I just see paragraph 38. It doesn't refer to the report. It just says the vehicle jerked. I understand, but that's also a reference to the expert's report that we cited too, that what the officer was referencing. It could have been better cited. I agree with you. It's not as if your complaint is challenging an allegation. It's saying the vehicle jerked. I understand. Once again, our contention is once he got to the stop and actually approached the vehicle and made contact with her, the stop is only a part of it. It does not give him the basis to arrest him for DWI until after he's gone through and conducted his testing, if he has reason to do so. If I don't have any other further questions, I'll take my time's up. Thank you, sir. Thank you, Your Honors. Thank you for your time. All right, sir. Mr. Mendelson? I want to make a few points, and I'll try to do so quickly. Mr. Mendelson, when this probable cause affidavit, PCA, when is that prepared? It was executed after the arrest, and that's why it's not a relevant document for Frank's liability purposes. It seems that my friend on the other side is relying on Frank's cases, which, as this Court has described in the Guerra case, quote, address the distinct issue of a material omission in a warrant application. This was a warrantless arrest, so Frank's has no bearing here. Well, that's my question. So he was arrested at the site, and then what is the procedure under Texas law for why a PCA is prepared in this instance? I can't speak to that in detail, because as the record reflects, the charges were dropped for lack of evidence. I can't speak to that in detail, but I guess maybe a good answer to the Court's question is even if Frank's applied, and we certainly submit that it doesn't, the corrected affidavit analysis under Frank's would certainly apply, and what's in there is, well, I did the test, and he failed the test, and that's enough. Frank, I'm just asking, what is the purpose of the probable cause arrest affidavit? It was to take, I think it was just to take, excuse me, what am I trying to say, to take Mr. McClain in front of the magistrate after the arrest, but regardless, Frank's is about getting an arrest warrant to go arrest somebody, so it really doesn't have bearing on this case. But why would we draw that distinction just as a conceptual matter? Because that's what this Court held in Guerra. Isn't deception a problem at any stage of the process? I certainly don't believe that an officer should ever lie in an affidavit or in any situation, period, to be very clear, but the arrest had nothing to do with that affidavit. There was no prosecution, so the affidavit's really immaterial to the arrest. The arrests end when the handcuffs are put on. I was addressing, I get your point that it doesn't matter for purposes of your case, but just as a conceptual matter, it doesn't seem crazy to extend Frank's, at least some hypothetical future case, to prohibit deception in other contexts. Maybe so, maybe not, but the issue isn't before the court. It's not presented. The issue is what? I said that specific issue isn't before the court. I do want to be sure to discuss what Judge Ho was quoting at Record 371. That's exactly right. It does say the vehicle jerked in the operative complaint. That's a judicial admission. And directly under that on the same page, this is, again, Record 371. It says that McLean, this is a judicial admission, says that Delgado had reasonable suspicion. There's no other way to read the phrase he had reasonable suspicion other than seeing a swerving vehicle, even if it wasn't a swerving vehicle. If he had reasonable suspicion, at the very least he had enough for the Terry stop. Where is that? It's at Record 371. He says specifically he only had reasonable suspicion, not probable cause. And I addressed that earlier. That's a little bit problematic of a statement for a Terry stop. But the point is he says there was reasonable suspicion, and the only way we can read that is that there was a swerving vehicle. And also, if he had wanted, if Mr. McLean had wanted to put in an affidavit denying that, he could have. Instead, he seemingly admitted it twice. And what he says on the video is, I'm sorry, I was messing with my radio, I'm sorry. The same thing is true of the walk and turn test. It's an undisputed fact. If he had wanted to say my feet were together, I passed the test, he could have done that, he didn't. I know that Judge Jones said that the court, of course, hasn't been trained like a police officer might be on an HGN exam. Well, yes, and their own expert says that he followed the NHTSA standards when he was doing the HGN test, which means all at most it was was a reasonable mistake of fact at the very most. The other point that I want to be sure to address is the bloodshot eyes in the slurred speech. We're not contending that those facts are material to the arrest. And as to the bloodshot speech, his own brief is internally inconsistent. First it says that the video completely contradicts seeing bloodshot eyes, and then it says the video isn't very clear as to whether or not bloodshot eyes in the same brief. But we don't think that fact matters, and we're not relying on it. The same with the slurred speech. We don't think that the observation of the slurred speech or whether he was simply chewing on a snack in his mouth when he was driving, none of that in our view is any fact that the court needs to rely on. And so it's simply not material. The last point I want to be sure – actually, two other points I want to be sure to make. One is either the walk-in turn test or the HGN test, certainly when combined with the sight of a swerving vehicle is enough for probable cause because those are considered 79 or 88 percent accurate. So even if there's a dispute as to either of them, you don't have to have both of them, certainly when combined with the swerving. What is in the record as to the extent of the swerve? There is test of time and distance. I see my time has expired. May I answer the Court's question? Of course. Thank you. What's in the record on the swerve is that there's no video of the actual swerve, but on the videotape when Delgado first encounters McLean, he says, hey, I noticed that you weren't maintaining a single lane. It seems you were swerving several times and swerving your vehicle back, and it seems like you're not maintaining a single lane. And that's the point where McLean says, oh, I'm sorry, I was messing with my radio. I'm sorry. So there's stuff on the video of Mr. Delgado talking about what he saw. That's not a litigation document. There's no evidence of the time, length of time, or distance of the swerve or swerves. Well, there's no time stamp. I'm not asking that. I'll restate. Did Delgado in the record ever say he swerved for 15 seconds and he covered 50 feet? No, he didn't. But what he said is that he saw him swerve several times. He makes that statement to McLean, and he makes that statement to McKay when they're in their car talking about what he saw. Nonetheless, it's an undisputed fact, and I see my time has expired, and so we would ask that the Court reverse. All right. Thank you very much. That concludes the cases for the morning.